**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

Tondalaya Gamble, M.D.

     Plaintiff,

        v.

County of Cook, et al.,

     Defendants.

Case No. 19-cv-4297

Judge Mary M. Rowland

**MEMORANDUM OPINION AND ORDER**

    Plaintiff Tondalaya Gamble, a former doctor at Chicago's John Stroger Hospital, brings this suit against her former employer, Defendants Cook County, Edward Linn, and Fidel Abrego, claiming that Defendants violated federal statutes prohibiting race discrimination. Defendants have moved for summary judgment on Plaintiff's claims. [84]. For the reasons explained below, this Court grants Defendants' motion.

**I.    Background**

    The following facts come from Defendants' statement of facts [86], Plaintiff's statement of additional facts [87], and their respective responses [88]; [97].

**A.    The Parties**

    Defendant Cook County funds the Cook County Health and Hospitals System. [86] ¶ 1. Cook County employed Plaintiff in the position of attending physician in the obstetrics and gynecology department (Ob/Gyn Department) at John H. Stroger

Hospital from October 2009 until her voluntary resignation effective March 2020. *Id.* ¶ 2. Cook County employed Defendant Dr. Edward Linn as chair of the Ob/Gyn Department from 2008 until his resignation in December 2018. *Id.* ¶ 3. Defendant Dr. Fidel Abrego currently chairs the Ob/Gyn Department. *Id.* ¶ 4. Prior to Dr. Linn's resignation, Dr. Abrego reported to Dr. Linn and served as the division chair of the general Ob/Gyn division from 2011 through 2019. *Id.* ¶ 4. Until December 2018, Plaintiff reported to Drs. Linn and Abrego. *Id.* ¶ 5. After December 2018, Plaintiff reported to Dr. Abrego. *Id.*

## B. Structure of the Ob/Gyn Department

At all relevant times, a collective bargaining agreement (CBA) between Cook County and Services Employees International Union, Doctors Council governed the terms and conditions of employment for attending physicians in the Ob/Gyn Department, including for Plaintiff. *Id.* ¶ 7. The CBA provided that a physicians' work week will not exceed fifty hours; it also contained a pay scale that determined annual pay increases for bargaining unit members. *Id.*

As chair of the Ob/Gyn Department, Dr. Linn oversaw gynecology, obstetrics, and subspecialty gynecologic care at all CCH facilities, including Stroger, Provident Hospital, and the ambulatory clinic at Oak Forest Hospital. *Id.* ¶ 8. The Ob/Gyn Department consisted, at all relevant times, of five divisions, each led by a division chair reporting to Dr. Linn: general Ob/Gyn, maternal fetal medicine, reproductive endocrinology, gynecologic oncology, and family planning. *Id.* ¶ 9. Physicians in the

Ob/Gyn Department identify as either generalists, who provide general services, or subspecialists, who provide services of a subspeciality. *Id.* ¶ 10.

As the division chair of the general Ob/Gyn division, Dr. Abrego was responsible for overseeing the clinic work of the generalists in that division, assigning generalist physicians to clinics and operating rooms, overseeing the in-house call schedule and coverage, and approving time-off requests. *Id.* ¶ 12. The general Ob/Gyn division provided general obstetrics and gynecology services and staffed the general obstetrics clinic, the general gynecology clinic, the urogynecology clinic, and the labor and delivery unit of Stroger Hospital. *Id.* ¶ 13. For overnights and on weekends, one generalist was assigned to be present on site at Stroger Hospital and staff the in-house call to cover emergencies in the labor and delivery unit and the emergency department. *Id.* ¶ 14. Defendants claim that they evenly distributed the in-house call shift among all physicians in the general Ob/Gyn division and that each generalist performed an average of three in-house call shifts per month. *Id.* ¶ 15. Plaintiff counters that two generalists took fewer shifts because they worked only part-time, and one generalist, Dr. Bruce Rosenzweig, did not take any in-house call shifts. [88] ¶ 15.

All generalists shared core responsibilities, including in-house call shifts; however, if a physician possessed a particular clinical interest, Drs. Linn and Abrego attempted to accommodate their preference when making clinic assignments. [86] ¶ 16. According to Defendants, to accommodate Plaintiff's interests, they assigned Plaintiff to the urogynecology diagnostic clinic on Mondays, the operating room on

Wednesdays, and the urogynecology clinic on Thursdays. *Id.* ¶ 18. Defendants also assigned Plaintiff to the urogynecology clinic because there was a "backlog" of patients and because urogynecology was an "urgency." [88] ¶ 18; [87] ¶ 8.

### C.      Hiring and Compensation

If the Ob/Gyn Department wanted to hire into a vacancy created by an existing position that was vacated, the department chair submitted paperwork to Human Resources and the chief medical officer to obtain approval. [86] ¶ 19. Once approved, the chair and division chair interviewed and selected a candidate and submitted a request to Human Resources and the chief medical officer to hire a particular individual. *Id.*

The process of creating a new position was more complicated in that, in addition to the steps above, the chair and division chair also needed budgetary approval from CCH's board of directors. *Id.* ¶ 20. According to Defendants, CCH administration has in recent years identified the gynecologic oncology, obstetrics deliveries and services, and expanding community clinics as strategic priorities, but has never identified urogynecology services as a priority. *Id.* ¶ 21.

Drs. Linn and Abrego did not take part of salary negotiations and did not have any a role in setting a candidate's annual salary. *Id.* ¶ 22. The Human Resources department set and negotiated salaries for newly hired physicians. *Id.* ¶ 23. The current chief medical officer, Dr. Claudia Fegan, has been in the role since 2013 and was not involved in setting Plaintiff's salary. *Id.* ¶ 24.

### D.     Hiring Plaintiff

After completing a fellowship in urogynecology in 2009, Plaintiff was interested in working at Stroger because she had completed a rotation there during medical school and wanted to work with Stroger's patient population. *Id.* ¶ 25. In or about 2009, Plaintiff interviewed with Drs. Linn and Abrego. *Id.* ¶ 26. During her third interview, Dr. Linn explained that the only position available was a generalist position, but that if Defendants hired her, she would be able to focus her practice on urogynecology. [87] ¶ 1. Dr. Linn asked if Plaintiff would be willing to temporarily assist with covering in-house obstetrics call shifts—typically a generalist responsibility—until Cook County hired more generalists; Dr. Linn said he would need her to cover these shifts for twelve to eighteen months, and Plaintiff agreed to do so. *Id.* ¶ 2. Dr. Linn noted in his decision to hire form that he wanted to hire Plaintiff for her urogynecology experience and because she would be a "tremendous help in alleviating the backlog of urogynecology patients." *Id.* ¶ 3.

At the time of her hire, Plaintiff was not board certified in urogynecology. [86] ¶ 30. She did not become board certified until June 2013. *Id.* ¶ 31. When Plaintiff began working in October 2009, Cook County gave her a starting salary of $235,250.08. *Id.* ¶ 32. Throughout her employment, Plaintiff's salary increased until her resignation in March 2020, when she was earning $359,746.98, more than any other generalist employed in the general Ob/Gyn division at the time. *Id.*

5

### E.    Plaintiff's Employment

When Plaintiff began working in 2009, Defendants assigned her to staff the weekly urogynecology clinic, along with Dr. Rosenzweig, a part-time urogynecologist. *Id.* ¶ 34. Plaintiff's duties in that clinic included seeing patients, competing pre-operative examinations, and operating on patients. *Id.*

Sometime in 2010, Cook County eliminated Dr. Rosenzweig's position due to budget cuts. *Id.* ¶ 35. Plaintiff claims that, starting in 2011, she requested assistance from Drs. Linn, Abrego, and Fegan because she felt that she was overworked, and that those doctors ignored her requests for help. *Id.* ¶ 36. Plaintiff acknowledges, however, that those doctors also did not object to her attempts to limit the number of patients that could schedule a visit to the urogynecology clinic; they were also open to Plaintiff's request to open the clinic on another day, if space, staff, and approval could be secured. *Id.* ¶ 38.

In or about February 2013, in response to Plaintiff's request for additional staff and equipment in the clinic, Dr. Abrego said to Plaintiff, "maybe this is not the place for you to be working." *Id.* ¶ 39. Dr. Abrego maintains he made this comment because resources were limited at Stroger and there was a hiring freeze in place at the time. *Id.* Plaintiff, on the other hand, believes he made the comment because he was tired of her requests for assistance and did not want her working in the Ob/Gyn Department anymore. [88] ¶ 39.

In 2013, Drs. Linn and Abrego hired and assigned a physician assistant, Sinchieze Nwabudike, to assist Plaintiff in the urogynecology clinic. [86] ¶ 40. Dr.

6

Abrego also assigned another generalist, Dr. Carmen Adams, to assist in the urogynecology clinic. *Id.* ¶ 41.

While generalists can perform some aspects of urogynecology, they cannot perform all aspects. [87] ¶ 9. Dr. Linn testified it was "not ideal" to have a generalist staff the urogynecology clinic. *Id.* When asked whether Plaintiff functioned in a dual role as a generalist and subspecialist, Dr. Linn testified that she functioned as an "episodic Generalist," meaning that she occasionally did general work and covered three- to four in-house call shifts per month but spent most of her time with patients in the urogynecology clinic or the operating room. *Id.* ¶ 10. When Plaintiff was out of the office or on leave, Defendants scheduled other generalists, including Dr. Abrego, Dr. Gandia, and Dr. App, to fill in. [86] ¶ 43.

In order to address Plaintiff's concerns about her workload, Drs. Linn and Abrego encouraged Plaintiff to stop seeing walk-ins and to change the scheduling rules. *Id.* ¶ 44. Other physicians in the Ob/Gyn Department expressed similar complaints regarding work/life balance and the need for better equipment, more staff, and additional examination rooms. *Id.* ¶ 45.

### F. Plaintiff's Complaints, Requests to Transfer Out of the Urogynecology Clinic, and Resignation

Plaintiff claims that during a meeting in March 2013 with Drs. Linn, Abrego, and Fegan, she discovered that Cook County paid her less than Dr. Edgardo Yordan (white), Dr. Sameer Sharma (Asian), and Dr. Karen Fish (white). *Id.* ¶ 46. Both Drs. Yordan and Sharma worked as part-time gynecologic oncologists, and Dr. Fish was a generalist. *Id.*

7

In February 2013, Plaintiff's union representative reached out to Dr. Fegan and explained that Plaintiff's treatment may amount to race discrimination. [87] ¶ 29. Dr. Fegan spoke with Drs. Linn and Abrego and concluded she "[did not] see how race [was] a factor." *Id.* In March 2013, the Union filed a grievance on behalf of Plaintiff, alleging discriminatory compensation. *Id.* ¶ 47. The Union settled the grievance on November 2, 2014, resulting in an approximately $26,000 increase in Plaintiff's annual salary. *Id.* ¶ 48.

Drs. Linn and Abrego refused Plaintiff's requests to be removed from the in-house call. [86] ¶ 50. In addition, Plaintiff began asking verbally to be removed from the urogynecology clinic in or around 2013 because she no longer felt she could treat patients safely while working as both a generalist and a subspecialist. [87] ¶ 26. Drs. Linn and Abrego do not recall these verbal requests. [97] ¶ 26. Plaintiff then made the requests in writing—first to Dr. Fegan in August 2019, then to Dr. Abrego in October 2019. [87] ¶ 26.

Plaintiff notified Dr. Abrego of her intent to resign on or around December 9, 2019. [87] ¶ 31. On February 25, 2020, Plaintiff submitted her resignation effective March 13, 2020. [86] ¶ 52.

### G. Salary Comparisons

At the time of Plaintiff's hire, Cook County employed a part-time urogynecologist working in Stroger's Ob/Gyn Department, Dr. Bruce Rosenzweig. [87] ¶ 32. Dr. Rosenzweig covered a urogynecology clinic on Thursdays and saw patients in the operating room on Wednesdays. *Id.* ¶ 33. When Plaintiff started

working with Cook County in 2009, she worked with Dr. Rosenzweig in the clinic. *Id.* Cook County did not expect Dr. Rosenzweig to perform any generalist duties, including in-house call shifts. *Id.* ¶ 34. At the time of Plaintiff's hire, Cook County paid Dr. Rosenzweig $8,480 every two weeks for his part-time role. *Id.* ¶ 38.

Plaintiff claims that, when Dr. Rosenzweig left about one year after Plaintiff began working at Stroger, she became the sole urogynecologist and her workload increased. *Id.* ¶ 35. Defendants, on the other hand, state that Plaintiff remained a generalist, not a urogynecologist, and that her overall workload did not increase as she remained subject to the fifty-hour workweek limit pursuant to the CBA. [97] ¶ 35.

Cook County hired Dr. Fish, a white doctor, in 2008 at an annual salary of $243,996.48. [86] ¶ 65. Defendants hired her because they needed someone with minimally invasive or laparoscopic surgery experience. *Id.* ¶ 67; [88] ¶ 67. At the time of her hire, Dr. Fish had finished a minimally invasive surgery fellowship and had extensive experience in minimally invasive surgery. [86] ¶ 68. By November 2, 2014, Plaintiff was earning $281,295.04 per year, while Dr. Fish was earning $277,118.40. [87] ¶ 39. By May 3, 2015, Dr. Fish was earning $288,388.24, while Plaintiff was earning $286,963.04 per year. *Id.* ¶ 33. As of Dr. Fish's resignation date of January 2, 2018, she was earning $333,869.12; in contrast, Plaintiff was earning $332,207.20. *Id.* Neither Dr. Linn nor Dr. Abrego were personally involved in setting Dr. Fish's salary. [86] ¶ 71.

### H.    Availability of Subspecialist Positions

Plaintiff claims that, despite her requests to Drs. Linn and Abrego to give her the title and compensation of a subspecialist, they did not place her into such a position. *Id.* ¶ 54.

All of the Ob/Gyn Department subspecialist positions posted during Plaintiff's employment were for specialties outside of urogynecology. *Id.* ¶ 55. Plaintiff did not apply or meet the minimum qualifications for these positions. *Id.* In October 2018, Defendants created a subspecialist position for Dr. Anna Strohl, who is white and works as a part-time gynecologic oncologist. *Id.* ¶¶ 56, 57. Plaintiff did not apply for or meet the minimum qualifications for this position. *Id.* ¶ 57. In or about December 2019, the department of surgery at Stroger posted a vacancy for a urogynecologist, for which Plaintiff applied *Id.* ¶ 58. The posting, however, was removed and the position was never filled; the department determined that the proposal required more than just a urogynecologist. *Id.* ¶ 59.

### I.    Offensive Comments

Plaintiff claims that Dr. Linn made three racial comments during the course of her employment: (1) sometime in 2012, during a discussing about the Affordable Care Act and patients' options for care, Dr. Linn stood up during a departmental meeting and said to everyone, "slavery is over"; (2) another time in 2012 during a departmental meeting, the group discussed a very sick African American patient and Dr. Linn said to everyone, "you know, we might find her dead on a bus stop somewhere"; and (3) sometime in 2014, Plaintiff presented a case during a

departmental meeting about a patient on whom she operated, and Dr. Linn "bursted out that she tried to kill someone over a bulge." *Id.* ¶ 63.

Dr. Linn recalled the discussion about the Affordable Care Act in the 2012 meeting: He claims that the discussion centered around the fact that uninsured patients could now choose to obtain their medical care and no longer had to obtain care at Stroger. *Id.* ¶ 64.

### J. Plaintiff's Allegations

In this lawsuit, Plaintiff brings four counts for race discrimination: Title VII of the Civil Rights Act of 1964 against Cook County (Count I), 42 U.S.C. § 1983 against Drs. Linn and Abrego (Count II); the Illinois Human Rights Act (IHRA) against Cook County (Count III); and 42 U.S.C. § 1981 against Drs. Linn and Abrego (Count IV).

## II. Legal Standard

Summary judgment is proper where there is "no dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine dispute as to any material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The party seeking summary judgment has the burden of establishing that there is no genuine dispute as to any material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

In determining whether a genuine issue of material fact exists, this Court must construe all facts and reasonable inferences in the light most favorable to the non-moving party. *Jones v. Mathews*, 2 F.4th 607, 612 (7th Cir. 2021). The non-moving

party bears the burden of identifying the evidence creating an issue of fact. *Weaver v. Speedway, LLC*, 28 F.4th 816, 820 (7th Cir. 2022). To satisfy that burden, the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Thus, a mere "scintilla of evidence" supporting the non-movant's position does not suffice; instead "there must be evidence on which the jury could reasonably find" for the non-moving party. *Anderson*, 477 U.S. at 252.

## III. Analysis

Plaintiff claims that Defendants subjected her to adverse actions because of her race in violation of Title VII, Section 1981, Section 1983 and the IHRA. [90] at 9. This Court uses the same standards in evaluating all of these claims. *Mahran v. Advoc. Christ Med. Ctr.*, 12 F.4th 708, 714 (7th Cir. 2021) (observing that the "legal standard is the same under" Title VII, Section 1981, and the IHRA); *Barnes v. Bd. of Trustees of Univ. of Ill.*, 946 F.3d 384, 389 (7th Cir. 2020) ("The legal standard for analyzing racial discrimination claims under Title VII and § 1983 is the same.").

First, Plaintiff may use the framework developed by the Supreme Court in *McDonnell Douglas v. Green*, 411 U.S. 792 (1973). Under *McDonnell Douglas*, a plaintiff must first establish a prima facie case by showing that: "(1) he belongs to a protected class; (2) he met his employer's legitimate expectations; (3) he suffered an adverse employment action; and (4) another similarly situated employee outside of his protected class received better treatment from his employer." *Igasaki v. Ill. Dep't of Fin. & Pro. Regul.*, 988 F.3d 948, 957 (7th Cir. 2021); *see also Chatman v. Bd. of*

*Educ. of City of Chi.*, 5 F.4th 738, 746 (7th Cir. 2021). Once the plaintiff establishes a prima facie case, the burden then "shifts to the employer to offer a nondiscriminatory motive"; if the employer does this, "the burden shifts back to the plaintiff to show that the employer's stated reason was a pretext." *Igasaki*, 988 F.3d at 957 (quoting *Purtue v. Wis. Dep't of Corr.*, 963 F.3d 598, 601–02 (7th Cir. 2020), *reh'g denied* (July 31, 2020)).

In *Ortiz v. Werner Enterprises, Inc.*, the Seventh Circuit introduced an alternative to the *McDonnell Douglas* framework. Under *Ortiz*, the core question in any employment discrimination case "is simply whether the evidence would permit a reasonable factfinder to conclude that the plaintiff's race . . . caused the discharge or other adverse employment action" at issue. 834 F.3d 760, 765 (7th Cir. 2016). When using this approach, courts ask only "whether the totality of the evidence shows discrimination, eschewing any framework or formula." *Igasaki*, 988 F.3d at 958 (citing *Ortiz*, 834 F.3d at 765). The Seventh Circuit's decision in *Ortiz*, however, "did not alter '*McDonnell Douglas* or any other burden-shifting framework.'" *McKinney v. Office of Sheriff of Whitley Cty.*, 866 F.3d 803, 807 (7th Cir. 2017) (quoting *Ortiz*, 834 F.3d at 766). Because Plaintiff proceeds under both the *Ortiz* and *McDonnell Douglas* frameworks, this Court will, too.

## A. *McDonnell Douglas*

Beginning with the *McDonnell Douglas* framework, Defendants do not dispute that Plaintiff has met the first two elements of her *prima facie* case—that Plaintiff's race qualifies her as a member of a protected class and that she met Defendants'

legitimate work expectations. Instead, Defendants argue that Plaintiff's discrimination claims fail under *McDonnell Douglas* because she cannot demonstrate either an adverse action or that similarly situated employees received favorable treatment.

### 1. Adverse Action

On the element of adverse action, Defendants contend that there is no evidence that Plaintiff experienced any adverse action because she was never disciplined, demoted, or denied a pay raise throughout her ten years of employment. [85] at 16. This Court agrees. A materially adverse employment action is one where the plaintiff suffers "a significant change in employment status." *Reives v. Ill. State Police*, 29 F.4th 887, 891 (7th Cir. 2022) (quoting *Boss v. Castro*, 816 F.3d 910, 917 (7th Cir. 2016)). Adverse employment actions fall into three categories: (1) termination or reduction in financial terms of employment; (2) transfers or changes in job duties that "cause an employee's skills to atrophy and reduce further career prospects"; and (3) "unbearable changes" in job conditions, such as a hostile work environment or conditions amounting to constructive discharge. *Id.* (quoting *Barton v. Zimmer*, 662 F.3d 448, 453–54 (7th Cir. 2011)).

Plaintiff does not provide any evidence of an adverse action falling into one of these three buckets. Defendants did not terminate Plaintiff; she resigned. Defendants also never reduced her pay or cut her benefits; instead, her salary steadily increased throughout her tenure at Stroger. The record also contains no evidence that Defendants altered her job duties to such a degree that harmed her skills or future

career prospects. Although Plaintiff complains that she experienced a heavier workload as the sole practitioner working in the urogynecology clinic, "harder work assignments do not constitute an adverse employment action." *Fane v. Locke Reynolds, LLP*, 480 F.3d 534, 539 (7th Cir. 2007); *see also, e.g.*, *Saggu v. Dejoy*, No. 19 C 2303, 2021 WL 1165106, at *12 (N.D. Ill. Mar. 26, 2021) (holding that assigning a plaintiff additional units to supervise is nonactionable because "harder work assignments do not amount to adverse employment actions"); *Fidishin v. Gary Cmty. Sch. Corp.*, No. 2:18-CV-97-TLS, 2022 WL 326544, at *10 (N.D. Ind. Feb. 2, 2022) ("None of the actions described by the Plaintiff suggest anything more than a difficult boss and a stressful job, which do not amount to a materially adverse change in her employment.").

Plaintiff also does not demonstrate that Defendants subjected her to a legally hostile work environment, which, as explained above, can amount to an adverse action. To prove an employment environment was actionably hostile, Plaintiff must show that: (1) she was subject to unwelcome harassment; (2) the harassment was based on race; (3) the harassment was severe or pervasive to a degree that altered the conditions of employment and created a hostile or abusive work environment; and (4) there is a basis for employer liability. *Gates v. Bd. of Educ. of the City of Chi.*, 916 F.3d 631, 636 (7th Cir. 2019). Plaintiff believes that Dr. Linn directed three instances of racial harassment at her during her decade-long employment: (1) sometime in 2012, during a discussing about the Affordable Care Act and patients' options for seeking care, Dr. Linn stood up during a departmental meeting and said to everyone,

15

"slavery is over"; (2) during a 2012 meeting, the department discussed a very sick African American patient and Dr. Linn said to everyone, "you know, we might find her dead on a bus stop somewhere"; and (3) in 2014, Plaintiff presented a case during a departmental meeting about a patient on whom she operated, and Dr. Linn "bursted out that she tried to not kill someone over a bulge." [86] ¶ 63. Given the ambiguous nature of these comments and the lack of other evidence demonstrating a culture of racial animus, there is "insufficient evidence that [these] incidents were racially motivated." *Cole v. Bd. of Trs. of N. Ill. Univ.*, 838 F.3d 888, 896 (7th Cir. 2016). And even if they were, these minor and isolated interactions do not suggest a pattern of harassment so severe or pervasive that it altered the conditions of Plaintiff's employment. *See Kampmier v. Emeritus Corp.*, 472 F.3d 930, 941 (7th Cir. 2007); *see also Johnson v. Advoc. Health & Hosps. Corp.*, 892 F.3d 887, 900 (7th Cir. 2018) ("Offhand comments, isolated incidents, and simple teasing do not rise to the level of conduct that alters the terms and conditions of employment.") (quoting *Passananti v. Cook County*, 689 F.3d 655, 667 (7th Cir. 2012)).

For her part, Plaintiff argues, in an undeveloped footnote, that the "disparate treatment" she experienced constitutes the relevant adverse action in this case. [90] at 15–16 n.3. But in *Traylor v. Brown*, the Seventh Circuit rejected the notion that "disparate treatment . . . is *itself* an adverse employment action." 295 F.3d 783, 789–90 (7th Cir. 2002). The Seventh Circuit reasoned that the argument would "convert the four-pronged *prima facie* case into a three-pronged one," thus contravening settled Title VII law requiring plaintiffs to prove four elements. *Id.* at 790; *see also*

*Poullard v. McDonald*, 829 F.3d 844, 855 (7th Cir. 2016) ("A successful disparate treatment claim *requires* some materially adverse employment action.") (emphasis added); *see also, e.g.*, *Davis v. Belvidere Police Dep't*, No. 01 C 50469, 2003 WL 21251986, at *1 (N.D. Ill. May 29, 2003) (holding that "disparate treatment did not amount to, or result in, an adverse employment action" because disparate treatment "is not *itself* an adverse employment action"). Plaintiff offers no other evidence or argument suggesting that Defendants subjected her to an adverse employment action. Accordingly, Plaintiff has failed to raise a triable issue of fact on the element of adverse employment action. For this reason alone, her race discrimination claims fail under the *McDonnell Douglas* framework.

### 2.    Similarly-Situated Employees

Plaintiff's *prima facie* case also fails under *McDonnell Douglas* because she has not identified a similarly-situated comparator who Defendants treated more favorably.

While similarly-situated parties need not be identical in every conceivable way, they must be directly comparable to the plaintiff in "all material respects." *Marnocha v. St. Vincent Hosp. & Health Care Ctr., Inc.*, 986 F.3d 711, 719 (7th Cir. 2021) (quoting *Coleman v. Donahoe*, 667 F.3d 835, 846 (7th Cir. 2012)). Factors considered here "most often include whether the employees (i) held the same job description, (ii) were subject to the same standards, (iii) were subordinate to the same supervisor, and (iv) had comparable experience, education, and other qualifications—provided the employer considered the latter factors in making the personnel decision."

*Brummett v. Sinclair Broad. Grp., Inc.*, 414 F.3d 686, 692–93 (7th Cir. 2005) (quoting *Ajayi v. Aramark Bus. Servs., Inc.*, 336 F.3d 520, 532 (7th Cir. 2003)). Moreover, a similarly-situated employee cannot share a plaintiff's "race, sex, religion, or other protected status." *Howell v. Wexford Health Sources, Inc.*, 987 F.3d 647, 656 (7th Cir. 2021). Plaintiff argues that Defendants treated her worse than both Dr. Rosenzweig, a white urogynecology subspecialist, and Dr. Karen Fish, a white Ob/Gyn generalist. [90] at 10.

As to Dr. Rosenzweig, Plaintiff emphasizes that Defendants did not require him to cover generalist responsibilities such as general clinics or in-house call shifts but paid him more than they paid Plaintiff. *Id.* at 11. But the fact that Dr. Rosenzweig worked part-time while Plaintiff worked full-time "undermines any finding" that they were similarly situated. *Reehoff v. Bath & Body Works, LLC*, No. 13 C 8073, 2016 WL 1270428, at *5 (N.D. Ill. Mar. 30, 2016) (finding "too many differences" between full-time and part-time employees to "consider them comparable enough"); *see Ilhardt v. Sara Lee Corp.*, 118 F.3d 1151, 1155 (7th Cir. 1997) (observing that "full-time employees are simply not similarly situated to part-time employees"). Further, Dr. Rosenzweig "had different levels of experience and job responsibilities" than Plaintiff. *Patterson v. Avery Dennison Corp.*, 281 F.3d 676, 680 (7th Cir. 2002). That is, Defendants did not expect Dr. Rosenzweig to perform any generalist duties, including in-house call shifts, as it did Plaintiff. [87] ¶ 34. And there is no evidence that Dr. Rosenzweig belonged to the same union or that his employment terms, such as his work hours and salary increases, were governed by the same CBA that governed

Plaintiff's terms of employment. For these reasons, Dr. Rosenzweig does not qualify as similarly-situated to Plaintiff such that this Court can draw a meaningful comparison between the two physicians.

Plaintiff also argues that Dr. Fish is a similarly-situated employee and that Defendants treated Dr. Fish better by assigning her to cover the gynecology clinic, as opposed to certified-subspecialty responsibilities; providing her more support (two Pas) in the gynecology clinic than Plaintiff had in her urogynecology clinic; and paying Dr. Fish more than Plaintiff. [90] at 13. To be fair, Dr. Fish and Plaintiff are more similar than Dr. Rosenzweig and Plaintiff: They worked in the same Ob/Gyn Department, held the same official title (generalist), shared some of the same core responsibilities as generalists, reported to the same supervisors (Drs. Abrego and Linn), and were subject to the same CBA. [86] ¶¶ 3, 4, 7, 11, 16, 17, 70. The more fulsome record, however, does not support the conclusions that Dr. Fish is a proper comparator or that Defendants actually treated her more favorably.

For instance, the record does not support the notion that Plaintiff and Dr. Fish are similarly-situated when evaluating Plaintiff's theory of disparate pay. Plaintiff complains that Cook County hired Dr. Fish in 2008 at an annual salary of $243,996.48, while it hired Plaintiff eight months later at a lower salary of $235,250.08. [90] at 13; *see* [86] ¶¶ 32, 65. Yet the record reflects that Plaintiff and Dr. Fish "did not have comparable levels of experience" at the time of their hires. *Reid v. Wal-Mart Stores, Inc.*, 274 F. Supp. 3d 817, 824 (N.D. Ill. 2017); *see also Rucker v. Ill. Dep't of Child. & Fam. Servs.*, 326 F. App'x 397, 399 (7th Cir. 2009) (finding two

19

employees not similarly-situated even if they held the same title and reported to the same supervisor because, among other things, the comparator "had more relevant work experience" justifying his higher salary). When Defendants hired Dr. Fish, she had completed a fellowship in minimally invasive surgery and "had extensive experience in minimally invasive surgery." [86] ¶ 68. In comparison, when Defendants hired Plaintiff in 2009, Plaintiff had just completed her urogynecology fellowship and did not have "extensive experience" in her specialty of urogynecology as Dr. Fish had in minimally invasive surgery. *Id.* ¶¶ 25, 28. Given that Plaintiff and Dr. Fish had different levels of relevant experience at the time of their hires, they are not suitable comparators when evaluating the discrepancies in their initial salaries. *See Wells-Griffin v. St. Xavier Univ.*, 26 F. Supp. 3d 785, 797 (N.D. Ill. 2014) ("[C]omparators must be similar enough that differences in their treatment cannot be explained by other variables, such as distinctions in their roles or performance histories[.]") (alterations in original) (quoting *Senske v. Sybase. Inc.*, 588 F.3d 501, 510 (7th Cir. 2009)).

Plaintiff also points to disparities in salary after their initial hires that she claims demonstrate that Defendants treated Dr. Fish more favorably. But by November 2, 2014, Plaintiff was earning $281,295.04 per year, while Dr. Fish was earning *less than Plaintiff* at $277,118.40. [87] ¶ 39. As a matter of law, the fact that Plaintiff was earning more than Dr. Fish in 2014 shows that Defendants did not treat Dr. Fish more favorably in terms of compensation that year. True, near the end of both doctors' tenures at Cook County, Dr. Fish earned slightly more than Plaintiff:

by May 3, 2015, Dr. Fish was earning $288,388.24, while Plaintiff was earning slightly less $286,963.04; and as of Dr. Fish's resignation date of January 2, 2018, she was earning $333,869.12, and Plaintiff was again earning slightly less at $332,207.20. *Id.* ¶ 33.

But the "existence of an equal title does not mean that the employee[s] had equal responsibilities" warranting equal pay. *Goetz v. City of Springfield*, 699 F. Supp. 2d 1066, 1078 (C.D. Ill. 2010) (citing *Ford v. Minteq Shapes and Servs., Inc.,* 587 F.3d 845, 848 (7th Cir. 2009)); *see also Palmer v. Ind. Univ.*, 31 F.4th 583, 590 (7th Cir. 2022) (noting that [the plaintiff professor's] "mere[ ] showing that his comparator is also a lecturer in the same department is not enough to meet his burden that the two are comparable"); *Tank v. T-Mobile USA, Inc.*, 758 F.3d 800, 810 (7th Cir. 2014) ("Tank assumes that because his alleged comparators were also T–Mobile regional VPs, the fact that he was paid less is enough to survive summary judgment. It is not."). The two doctors' job responsibilities differed in that they practiced in different clinics. [86] ¶¶ 17–18. In addition, as Plaintiff herself underscores, Dr. Linn considered her an "episodic generalist," meaning that Plaintiff only occasionally performed generalist work and spent the majority of her time in her clinic or the operating room. [87] ¶ 9. Plaintiff does not show that Dr. Fish performed comparable work as an "episodic generalist," and thus fails to allow a meaningful comparison between the two doctors. *See Eaton v. Ind. Dep't of Corr.*, 657 F.3d 551, 556 (7th Cir. 2011) (noting that the plaintiff must present enough evidence that "any differences in their treatment cannot be attributed to other variables.") (quoting

*Silverman v. Bd. of Educ. of Chi.,* 637 F.3d 729, 742 (7th Cir.2011)). Rather, Plaintiff is left with only speculation that she and Dr. Fish performed "equal work for unequal pay, with the protected class as the distinguishing factor." *Poullard*, 829 F.3d 844, 854 (7th Cir. 2016).

The record also does not support Plaintiff's contention that Defendants treated Dr. Fish more favorably because she did not have to cover certified-subspecialty responsibilities. *See* [90] at 13. Plaintiff does not fully develop this argument, rendering it waived. *See Crespo v. Colvin*, 824 F.3d 667, 674 (7th Cir. 2016). In any event, there is no basis for a jury to conclude that Dr. Fish's gynecology clinic assignment is objectively more favorable than Plaintiff's urogynecology assignment. Again, the only evidence that Dr. Fish's assignment was more favorable comes from Plaintiff's own "subjective opinion or speculation," which is insufficient at summary judgment. *Johnson*, 892 F.3d at 900 (rejecting the plaintiffs' speculation or subjective opinions that the defendant subjected them to "more strenuous" work on account of their race).

Plaintiff also argues that Defendants treated Dr. Fish better by supplying her with two PAs, while Plaintiff covered her own clinic from 2009 through 2013 without any dedicated PA assistance. [90] at 13. Again, however, Plaintiff fails to provide specific evidence about the two clinics, including how they are different and how they are the same. Without that evidence, it would be speculation to conclude that Defendant's staffing of PAs in the gynecology clinic reflects favorable treatment. Instead, there appear to be "differentiating or mitigating circumstances [sufficient to]

22

distinguish . . . the employer's treatment of them." *Slutsky v. Jacobson Cos.*, No. 1:16-CV-1073, 2017 WL 2813662, at *6 (N.D. Ill. June 29, 2017) (quotation omitted).

In sum, Plaintiff's failure to identify a similarly-situated comparator who received more favorable treatment is another independent reason that her *prima facie* case under *McDonnell Douglas* fails.

### B. *Ortiz*

Given *Ortiz's* "admonition to pile all the evidence together," this Court will also address whether Plaintiff has sufficient evidence by examining the record as a whole. *Barbera v. Pearson Educ., Inc.*, 906 F.3d 621, 631 (7th Cir. 2018). This holistic approach asks whether Plaintiff has presented sufficient evidence that would permit a rational jury to conclude that Defendants took any actions against her because of her race. *Ortiz*, 834 F.3d at 766. In addition to the arguments discussed above, Plaintiff directs this Court to several other pieces of evidence that she believes demonstrates Defendants' discriminatory motives.

### 1. Requests for Removal from the Urogynecology Clinic

Plaintiff claims that this Court can infer discriminatory intent from the fact that Defendants refused to remove her from the urogynecology clinic upon her requests. [90] at 20–21. Plaintiff points to evidence that she verbally asked Drs. Linn and Abrego to be removed from the urogynecology clinic and that they refused that request; she made the request again in 2019, in writing to Drs. Fegan and Abrego, right before her resignation. [87] ¶ 26. The fact that Defendants did not accommodate Plaintiff's requests does not, however, raise an inference of discriminatory intent.

Plaintiff served as a generalist, the urogynecology clinic fell under the general Ob/Gyn division, and generalists are responsible for staffing the clinic. [86] ¶ 13. Drs. Gandia and App, generalists who are not black, also staffed the urogynecology clinic when Plaintiff was absent and after Plaintiff eventually resigned [86] ¶¶ 43, 53. Because clinical responsibilities fell under Plaintiff's job responsibilities, Defendants possess a legitimate business reason for refusing Plaintiff's request to remove her from her clinic responsibilities. This Court is not a "super personnel department that second-guesses employer's business judgments." *Riley v. Elkhart Cmty. Sch.*, 829 F.3d 886, 895 (7th Cir. 2016) (quoting *Millbrook v. IBP, Inc.*, 280 F.3d 1169, 1181 (7th Cir. 2002)).

### 2.   On-Call Shifts

Similarly, this Court is unpersuaded by Plaintiff's contention that it can infer discrimination from Defendants' refusals to remove her in-house call shifts after Plaintiff complained that it was not safe to work both those shift and the urogynecology clinic. *Contra* [90] at 22. It is undisputed that in-house calls fall under a generalist's responsibilities, and Plaintiff served as a generalist. [86] ¶ 15. Thus, Defendants had a facially legitimate business reason for refusing Plaintiff's requests to be removed from the rotation for in-house call shifts. *See Riley*, 829 F.3d at 895. To be sure, as Plaintiff points out, Defendants did allow Dr. Vic Trinkus, a non-black generalist, to take fewer in-house call shifts; Plaintiff, however, also concedes that Dr. Trinkus worked part-time, and that Defendants had concerns about Dr. Trinkus' age and his ability to serve on-call patients. [87] ¶ 16. Thus, Defendants have a legitimate business reason for accommodating Dr. Trinkus, as it did for refusing

24

Plaintiff's request for fewer responsibilities. Plaintiff's complaint boils down to a dispute with Defendants' judgment calls on how they allocated in-house call shift responsibilities; this challenge to their judgment calls "does not create a jury issue." *Hosick v. Chi. State Univ. Bd. of Trs.*, 924 F. Supp. 2d 956, 978 (N.D. Ill. 2013).

### 3. Reclassification of Plaintiff's Title

Plaintiff next argues that Defendants could have reclassified her title, along with her pay, to reflect her increased clinical responsibilities, and that an inference of discriminatory intent arises from their refusal to do so. [90] at 17. Plaintiff emphasizes the facts that: (1) Cook County initially hired Dr. Linn into a senior attending physician role and later reclassified his role to department chair to reflect the work that he actually did; and (2) Dr. Fegan's testimony that reclassifying a vacancy is very common and happens all the time. *See id.*; [87] ¶¶ 23, 24.

This Court remains unpersuaded. Even if Defendants did, in fact, reclassify vacancies from time to time for other physicians, the record contains no evidence suggesting that Defendants' refusal to reclassify Plaintiff was anything but a legitimate business decision. As Defendants have explained, the process of creating a new position—including reclassifying an employee into the new position—requires budgetary approval from CCH's board of directors, which has in recent years identified the gynecologic oncology, obstetrics deliveries and services, and expanding community clinics as strategic priorities, but has never identified urogynecology services as a priority. [86] ¶¶ 20, 21. This is a legitimate business justification that explains why Defendants did not attempt to reclassify Plaintiff. Accordingly, this Court will not second-guess this decision. *Riley*, 829 F.3d at 895.

Plaintiff emphasizes Dr. Fegan's testimony that department chairs have a role in prioritizing departmental needs, after which she, as the chief medical officer, weighs departmental needs and determines priorities. [90] at 18–19; *see* [89-5] at 15. Plaintiff contends this testimony suggests that department chairs like Dr. Linn possessed primary responsibility for determining budgetary needs, and therefore is inconsistent with Defendants' argument that they required board approval to create a new position. [90] at 18–19. Not so. Both things can be true: as department chairs, Drs. Linn and Abrego could have possessed authority to advocate budgetary priorities to the administration, *and* they could have still faced budgetary constraints and administration approval in implementing their budgetary requests. Once again, Plaintiff's complaints boil down to Defendants' business judgments. Those business judgments of Defendants "have no place in determining whether the employer acted based on an improper motive." *Lauth v. Covance, Inc.*, 863 F.3d 708, 717 (7th Cir. 2017).

### 4.    Internal Discrimination Policy

Plaintiff also claims that, in 2013, Dr. Fegan did not, as an internal policy required, report the complaint to Defendant's equal employment opportunity division within seventy-hours of receipt. [90] at 22–23. An employer's deviation from its "own internal employment procedures" can sometimes raise an inference of discriminatory intent. *Rudin v. Lincoln Land Cmty. Coll.*, 420 F.3d 712, 727 (7th Cir. 2005); *see also Smith v. Chi. Transit Auth.*, 806 F.3d 900, 907 (7th Cir. 2015).

Here, however, the policy on which Plaintiff relies did not become effective until May 12, 2017, and therefore did not apply at the time of Plaintiff's complaint in

2013. [87] ¶ 30; [89-13]. Dr. Fegan confirmed this fact in her declaration, stating that as of 2013, there "was not a policy in place requiring managers to report discrimination complaints within 72 hours of receipt." [97-1] ¶ 5. No inference of discriminatory can arise from Dr. Fegan's failure to follow an alleged policy that did not exist.

### 5.    No Discriminatory Intent

Viewing the record holistically under *Ortiz*, the record contains insufficient evidence of discriminatory intent. Because Plaintiff establishes neither a *prima facie* case under *McDonnell Douglas* nor raises a triable issue on discriminatory intent under *Ortiz*, this Court grants summary judgment to Defendants.

## IV. Conclusion

For the reasons explained above, this Court grants Defendants' motion for summary judgment [84] and directs the Clerk to enter judgment in Defendants' favor. Civil case terminated.

Dated: March 3, 2023

Entered:

Mary M Rowland

_____
Mary M. Rowland
United States District Judge

27